IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Michael A. Dunn, | ) | No. CV 04-444-TUC-JMR (HCE) |
| | ) | |
| Plaintiff, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Jo Anne B. Barnhart, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

   Plaintiff Michael Dunn has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  On August 26, 2004, this Social Security Appeal was referred to Magistrate Judge Nancy Fiora pursuant to the Rules of Practice of this Court.  On July 8, 2005, this matter was referred to the undersigned Magistrate Judge given Magistrate Judge Fiora's retirement.

   Review of the administrative record submitted on November 29, 2004 revealed that portions of transcript pages 307 through 384 were missing.  Therefore, the Court directed Defendant to supplement the record by providing the full text of pages TR 307 though 384. (July 6, 2005 Order) On July 26, 2005, Defendant supplemented the record and reference herein to TR 307 through TR 384 is to the July 26, 2005 supplement (Doc. No. 21).

Pending before the Court are Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment.  For the following reasons, the Magistrate Judge recommends that the District Court, after its independent review, grant Plaintiff's Motion for Summary Judgment (hereinafter Plaintiff's MSJ) and deny Defendant's Cross-Motion for Summary Judgment (hereinafter Defendant's XMSJ).

I.      PROCEDURAL HISTORY

On May 21, 1999, Plaintiff submitted to the Social Security Administration (hereinafter SSA) an application for disability insurance.  (TR. 114-117)  Plaintiff indicated that he has been unable to work since August 10, 1998 due to a herniated disc in his lower back.  (TR. 120)

Plaintiff's application was initially denied on the ground that although Plaintiff "will not be able to return to [his] past work,...[he] should be able to do work which is less physically demanding."  (TR. 92-93)  Plaintiff's request for reconsideration of the decision was also denied.  (TR. 100)

Plaintiff then requested a hearing before an administrative law judge (hereinafter ALJ) and the matter came on for hearing on April 10, 2000 before ALJ Peter J. Baum.  (TR. 107, 56-89)  On July 25, 2000 the ALJ found that Plaintiff was unable to return to his past work; that Plaintiff had the residual functional capacity to perform a significant range of sedentary work;[1] and that Plaintiff was therefore not disabled as defined in the Social Security Act. (TR. 47)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (TR. 36) Upon review of the record including updated medical records, the Appeals Council denied Plaintiff's request for review.  (TR. 33-35)

---

[1]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 CFR § 404.1567(a).

Plaintiff next filed an action in this Court challenging the ALJ's finding.  (*Dunn v. Barnhart,* CV 02-244-TUC-DCB (GEE)) Upon the parties' stipulation, the Court remanded the matter for further consideration. (TR. 307)  In accordance with the Court's Order, the Appeals Council remanded the case to the ALJ for: further evaluation of the severity of Plaintiff's mental impairments; for further evaluation of Plaintiff's maximum residual functional capacity; for further consideration of the evidence submitted by the treating source, Dr. Lorenz, and other doctors; for further evidence from a vocational expert to clarify the effect of assessed limitations and to determine whether Plaintiff can perform any of his past relevant work or other work in light of his established functional limitations; and  if necessary, to request the treating sources to provide additional evidence and or clarification. (TR. 308-309)

Upon remand, a hearing was held on October 8, 2003 before ALJ Baum.  (TR. 424-448) On January 26, 2004, ALJ Baum issued his decision denying Plaintiff's claim.  (TR. 287-298)

Plaintiff requested review of the ALJ's decision and submitted supplemental evidence, including letters from Plaintiff's treating physicians Doctors Lorenz and Donnelly. (TR. 274-283)  On  July 28, 2004, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's January 26, 2004 decision the final decision of the Commissioner.  (TR. 271-273)

II.      THE RECORD ON APPEAL

A.      General background regarding Plaintiff and Plaintiff's statements in the record

Plaintiff was born on April 14, 1965.  (TR. 114) In January 2004, when the ALJ ruled on Plaintiff's claims, Plaintiff was 38 years of age.  (TR. 288) Plaintiff has been married since 1992, this is his second marriage.  (TR. 114-115) Plaintiff has two children.   (TR. 115)

Plaintiff completed school through the ninth grade.  (TR. 64) Plaintiff testified that he did not receive a GED.[2]  (TR. 64)

Plaintiff served in the Coast Guard from 1982 to 1985 (TR. 116) Plaintiff's past work history spans from 1985 through 1998 and includes air conditioning/plumbing technician, hardware store plumbing department manager, and warehouse salesman.  (TR. 121, 134-136)

Plaintiff injured his back while at work on August 6, 1998 when he was loading 60-70 pound pipe on a rack.  (TR. 166, 197) A pipe slipped off the rack causing Plaintiff to twist, rotate and fall.  (Id.)  Plaintiff underwent physical therapy but received no relief for his pain. After a September 1998 CT scan showed at L5-S1a small left paracentral disc herniation with slight displacement of the S1 root sleeve, Plaintiff received two steroid injections which did not relieve his pain.  (TR. 82, 185)  In March 1999, Plaintiff underwent a  microdisectomy.

Plaintiff testified that his back pain has not subsided despite the surgery and that due to back injury and resultant pain and depression: he was unable to work; he was in chronic pain;  the most comfortable position was lying down flat; during the day he stays in that position about 80% of the time; was able to sit at a 45 degree angle up for one hour and when taking pain pills he could sit up an additional hour; he was able to sit upright at his computer for approximately 20 to 30 minutes at a time; when eating, he had difficulty sitting straight up without a back support; he could  walk for approximately one hour, such as at the grocery store; when in an upright position, he often felt a "popping that happens in the lower back...and it causes pain–it just gets so bad that I just fall down.  That's happened about twice a week ever since the injury" and this pain could be so intense that it caused Plaintiff to vomit; and his sleep was interrupted by pain and he awakened about every two to three hours.  (TR. 71-72, 74-77, 79 84, 139)

---

[2]Plaintiff indicated in his Disability Report filed with SSA that he completed his GED.  (TR. 126) Additionally, a  2000 report by Dr. Jack LaWall indicates that Plaintiff reported having completed a GED while he was in the Coast Guard.  (TR. 253)

Plaintiff's average day consists of lying on the couch or bed watching television.  (TR. 139) He is able to cook dinner for his family although he requires assistance to get items below waist level.  (TR. 139) He is able to clean small loads of dishes although he experiences pain in his lower back after he has been standing for 30 minutes.  (TR. 140) He goes grocery shopping for small and light items only.  (TR. 140)

Plaintiff is unable to engage in any of his former hobbies such as fishing, camping or going out in his boat, although he also testified that he has gone fishing twice from 1998 to 2000.  (TR. 66; *see also* TR. 141) Plaintiff now has difficulty walking on uneven surfaces. (TR. 141) He is able to lie on the couch and work with plastic canvas craft projects.  (TR. 69, 84)

Since his injury, Plaintiff has driven to Phoenix, Arizona, by sharing the driving with his wife and switching drivers at rest stops along the way and also stopping so that he can stretch.   (TR. 73-74) As a passenger, he sits with the seat reclined.  (TR. 74)  Plaintiff can no longer drive his truck which has a manual transmission, he can only drive vehicles with an automatic transmission.  (TR. 141)

Plaintiff wears a brace on his midsection and uses a cane.   (TR. 78)

When Plaintiff attended pool therapy, the pain would increase soon after the process but there was no long-term increase or decrease in his pain level.  (TR. 76) Plaintiff testified that Physical Therapist Snyder determined that land therapy was not working for Plaintiff. (TR. 76)  Plaintiff has since found "low impact" physical therapy and stretching helpful. (TR. 436)

Plaintiff's head aches from the medication and he has difficulty remembering things and concentrating.  For example he must keep written recipes to make meals and he won't remember a movie that he just finished watching. (TR. 77, 432) The pain also keeps him from being able to concentrate and this was so prior to 2000.  (TR. 83, 431) His pain would make it difficult for him to follow a supervisor's instructions.  (TR. 83) He also experiences unexpected mood changes, becomes tearful, angry and frustrated.  (TR. 431-432)

- 5 -

Plaintiff's psychiatrist has suggested he try volunteering once a week for half an hour at a school.  (TR. 434) She has also told Plaintiff that "at some point [he]...might be able to return to some sort of work roughly ten hours or so a week."  (TR. 434-435)

Plaintiff does not believe that prior to June 2000 a job existed that he was capable of doing.  (TR. 433)

Plaintiff's medications include Paxil, Oxycontin, Ibuprofen, Phenfurgan for nausea, muscle relaxers such as Cyclobenzaprine and Flexril, Amotriptolene and Trazodone to assist with sleeping (TR. 79-81, 125, 155)  In the past, Plaintiff has also taken Vicodin (TR. 80)

B.      Medical evidence

1.      Plaintiff's physicians

On August 6, 1998, upon injury, Plaintiff was treated by Heeten Desai, M.D., at St. Joseph's Hospital.  (TR. 226) An x-ray taken the same day revealed: "Normal lumbar spine films." (TR. 227)  Dr. Desai diagnosed muscular strain, prescribed Vicodin and Ibuprofen, and directed Plaintiff to see his primary care physician.  (TR. 226)

On August 11, 1998, Plaintiff's treating physician Kristin Lorenz, D.O., diagnosed lumbosacral strain and prescribed Flexeril, Ibuprofen, Vicodin and physical therapy.  (TR. 218) Plaintiff continued to complain of pain.

A September 16, 1998 MRI revealed: "At L5-S1 there is a small left paracentral disc herniation with slight displacement of the left S1 root sleeve.  Correlation for left S1 radiculopathy is recommended."  (TR. 185)  Dr. Lorenz then referred Plaintiff to Jack Dunn, M.D.,[3] for a neurosurgical evaluation.  (TR. 197) Dr. Lorenz and Dr. Dunn referred Plaintiff to Randall Prust, M.D., for pain management.  (TR. 179 ) On November 17, 1998 Dr. Prust administered a steroid injection.  (TR. 178) On December 14, 1998, Plaintiff reported to Dr. Prust that the injection had not relieved his pain.  (TR. 173) Dr. Prust  administered another

---

[3]There is no indication in the record whether Dr. Dunn is any relation to Plaintiff Dunn.

steroid injection and stated that if that injection did not help, he would not attempt further injections. (TR. 173-174)

On January 19, 1999, Plaintiff saw Dr. Dunn and complained of pain and numbness in his back and thigh on the left.  (TR. 195) Dr. Dunn diagnosed Plaintiff as having "a large herniated disc compressing and deviating the S1 nerve root...this free quality causes only pain and no neurological deficit...He is not going to get better without decompressive surgery.  I told him about 90% of the people receive improvement with surgery so he can return to his normal work.  We require a Work Back Program after surgery."  (TR. 195)

On March 12, 1999, Dr. Dunn performed a left L5-S1 microdiscectomy.  (TR. 168) Dr. Dunn's March 13, 1999 Discharge Summary indicates that Plaintiff's "[p]rognosis was good." (TR. 165) By March 22, 1999, Dr. Dunn noted Plaintiff's complaint of a "'zinging' pain that will bother him every so often when he is doing nothing.  I have told him it's probably the nerve recovering." (TR. 192) Dr. Dunn found "[n]o radicular pain per se.  No sciatic notch tenderness."  (TR. 192) He placed Plaintiff "on a gentle walking exercise program...[h]e is to get up to three miles.  He will then get an evaluation for the work back program." (TR. 192)

On April 7, 1999, a physical therapist from NovaCare's C.O.R.E. Program recommended that Plaintiff receive physical therapy three times a week for two weeks. (TR. 191)

On April 28, 1999 Dr. Dunn reassured Plaintiff that "we are not going to hurt anything; we are not going to damage anything."  (TR. 190) Dr. Dunn opined that Plaintiff needed "to be in a gentle exercise program, and a progressive exercise program to be more flexible to get his cardiovascular status and his strength back to return to work." (TR. 190)

On May 27, 1999, David S. Nevria, B.S., C.E., Physiologist, at NovaCare saw Plaintiff on referral from Dr. Dunn who requested a "functional capacity evaluation.  The purpose of this evaluation is to determine what [Plaintiff's]...safe work capacity is at this time." (TR. 187) Mr. Nevria noted that he was unable to evaluate Plaintiff's "carrying

capacity" because of an equipment breakdown and Plaintiff's "unwillingness to wait until it was repaired." (TR. 187)   Because of the equipment malfunction, a physical capacity rating could not be established, but Plaintiff was able to lift ten pounds from the floor to shelf height safely.  (TR. 187) Plaintiff reported pain throughout the testing which included lifting and various positional tolerances.  (TR. 188) Mr. Nevria opined that "[a]nalyzing all the objective data and correlating that with the subjective reports and observations, this test is concluded to be a submaximal effort.  His realtime force graphs reflect a submaximal effort where the force steadily increases or is maintained throughout the entire test trial.  His heart rates increase significantly once in a while, but not consistently as would be expected." (TR. 188) Mr. Nevria recommended a work conditioning program to increase Plaintiff's cardiovascular condition, to increase his lifting strength, and to increase his back tolerance to work.  (TR. 189) "Based upon the testing, this may be a fairly extensive work conditioning program."  (TR. 189)

A July 9, 1999 MRI revealed "Findings most consistent with prior surgery at L5-S1 with no evidence of any recurrent disc material...there is nothing to suggest spinal stenosis...I do not see any findings to suggest a recurrent herniated nucleus pulposus."  (TR. 209)

On September 14, 1999, Plaintiff once again saw Dr. Prust for assistance with pain management.  (TR. 223-225) Plaintiff reported that even though it had been six months since his surgery, he still felt constant pain in his low back at a level of seven to eight on a scale of one to ten.  (TR. 223) Plaintiff also felt pain in his leg while walking or exercising.  (TR. 223)  Dr. Prust reviewed the post-operative MRI and found no recurrent disk herniation at L5-S1.  (TR. 224) Upon examining Plaintiff, he found "one active myofascial trigger point at L5 on the left."  (TR. 224) His impression was:

1. Myofascial pain syndrome.
2. Radicular low back pain.
3. Status post lumbar laminectomy.
4. Nicotine addiction.

(TR. 223) Dr. Prust did "not think [Plaintiff]...is going to ever be able to get back to his regular job of lifting 50, 60, 75 pounds on a regular basis, but certainly light and possibly even medium job category would work for him...I believe that it could be that this is primarily myofascial." (TR. 225)  Dr. Prust recommended: capsaicin cream; trigger point injections along with physical therapy; and switching Plaintiff from "tricyclic antidepressants before...bedtime" to Oxycontin.  (TR. 224-225)

On September 20, 1999, Dr. Lorenz assessed "Left low back pain - suspect mild fascial cause" and status post laminectomy.  (TR. 211) Plaintiff was continued on Oxycontin.  (TR. 211)  On that same date, Dr. Lorenz signed a form to recommend Plaintiff for a "Temporary Disability Parking Placard."  (TR. 222)

On November 8, 1999 Plaintiff had an initial evaluation with Don Synder, P.T. (hereinafter P.T. Snyder).   (TR. 239-240) P.T. Snyder indicated that Plaintiff was "[s]ignificantly limited secondary to increased left lumbosacral pain" when bending, sitting, walking for 15 minutes, lifting and carrying.   (TR. 239) Plaintiff was moderate to significantly affected when driving and sleeping.  (TR. 239) P.T.  Snyder's examination revealed that Plaintiff's ability to bend forward was "self-limited by 70 to 80% of full range secondary to increased subjective pain.  Left sidebending causes aggravation in the left lumbosacral region as well as right sidebending with it being worse with left sidebending and there is also aggravation with backward bending from a standing position."  (TR. 239-240) Plaintiff's range of motion appeared to be within normal limits.  (Tr. 240) "There is noted tenderness to spring testing at L5 as well as L4.  There is also noted muscle guarding in the paraspinals greater on the left than right hand side."  (TR. 240) P.T. Snyder formulated a treatment plan and stated that "[d]ue to his longstanding complaints, prognosis for achieving goals is fair at this time."  (TR. 240)

By November 19, 1999, P.T. Snyder reported that Plaintiff had been seen for five treatments of physical therapy and that Plaintiff "has made little overall progress toward rehab goals or to perhaps allow him to return to work," (TR. 238) P.T. Snyder recommended

that Plaintiff continue with a strengthening program using pool therapy instead.  (TR. 238) P.T. Snyder opined that "[t]here also appear to be some inconsistencies with his subjective pain in terms of objective findings."  (TR. 238)

Dr. Lorenz noted soon after P.T. Snyder's November 1999 report that "Dr. Strickoff neuroradiology at T[ucson] M[edical] C[enter] reviewed patients [sic] MR.  It showed some epidural fibrosis but no surgical disc, spinal stenosis or foramina stenosis."  (TR. 246)   Dr. Lorenz assessed: "Status post diskectomy with continued pain and lower extremity radiculopathy."  (TR. 246)   Dr. Lorenz recommended that Plaintiff begin "job retraining now with 10-15 pound weight limit" and pool exercises.  (TR. 246) Dr. Lorenz continued Plaintiff on Oxycontin.  (TR. 246)

On December 22, 1999, Dr. Lorenz noted that Plaintiff "is refusing further physical therapy after one visit.  Had spoken to Deborah Walter, M.D., and we concur that patient is at the end of possible rehabilitative treatment.  I recommend an independent medical examination with occupational specialist.  I recommend retraining, as this patient will not be able to return [sic] his previous line of work.  I will continue to give him Oxycontin..."  (TR. 245)

On January 17, 2000, Dr. Lorenz indicated that Plaintiff "has been participating in pool therapy...without improvement" and that Plaintiff felt increased pain after physical therapy.  (TR. 245) Plaintiff also reported feeling a pop in his low back followed by severe pain which causes nausea and vomiting.  (TR. 245) Dr. Lorenz assessed: "Chronic back pain with episodic nausea and vomiting."  (TR. 245) She discontinued Plaintiff's physical therapy and prescribed Oxycontin, Flexeril, Ibuprofren, Paxil, and Phenergan. (TR. 245)

On April 10, 2000, Dr. Lorenz completed a "Medical Assessment of Ability To Do Work-Related Activities (Mental)" indicating the following:

• Plaintiff was "Unlimited/Very Good" at following work rules; interacting with a supervisor; functioning independently; maintaining attention/concentration; understanding, remembering and carrying out complex job functions; understanding,

- 10 -

remembering, and carrying out detailed but not complex job instructions; understanding, remembering and carrying out simple job instructions; maintaining personal appearance; relating predictably in social situations; and demonstrating reliability

• Plaintiff was "good" at relating to co-workers; dealing with the public; using judgement; dealing with work stresses; and behaving in an emotionally stable manner.

(TR. 247-248)  Dr. Lorenz commented that Plaintiff's "disability is very frustrating to him and he can be short and irritable emotionally.  Concentration and intellect are unaffected. History is 'hard worker.'"  (TR. 247)

Additionally on April 10, 2000, Dr. Lorenz completed a "Medical Assessment of Ability To Do Work-Related Activities (Physical)."  (TR. 249-250) Therein, she indicated:

• Plaintiff could lift or carry less than ten pounds "[m]inimum [o]ccasionally (from very little up to 1/3 of an 8-hour day)"

• Plaintiff could stand or walk for a total of 45 minutes in an 8-hour day and for 15 minutes at a time without interruption

• Plaintiff could sit one hour in an 8-hour workday and for 15 minutes without interruption

• Plaintiff could never climb, balance, stoop, crouch, kneel or crawl

• Plaintiff's ability to reach, push and pull are affected by his impairment

• Plaintiff should not be exposed to heights, moving machinery, temperature extremes, vibration and humidity.

(TR. 249-250) Dr. Lorenz further commented that Plaintiff suffered from "chronic pain L-5 pain radiates to LLE" with walking more than 15 minutes, and with sitting and standing more than 10 minutes at a time.  (TR. 249)

In May 2000, Dr. Lorenz noted that Plaintiff continued to have severe low back pain. (TR. 407) "Activity is minimal–occasional grocery shopping and occasional walking as [sic] backyard.  Plans to sell his boats because he no longer enjoys them and is unable to load

them, etc.  Reports significant depression.  Is still unable to identify other areas of interest. He continues to be frustrated with the loss of his previous level of physical activity." (TR. 407) Dr. Lorenz assessed: Chronic low back pain–status post diskectomy.  (TR. 407)

On June 1, 2000, Plaintiff saw Steven Gurgevich, Ph.D., for medical and psychological pain management.  (TR. 257-259) Plaintiff was frustrated and defensive regarding the insurance carrier and some of the doctors he had seen.  (TR. 257) Specifically, Plaintiff expressed negative sentiments about Dr. Dunn, Dr. LaWall, various technicians and NovaCare.  (TR. 258) Plaintiff maintained that he has been treated well by Doctors Lorenz, Walter, and Prust.  (TR. 258)   Plaintiff "denies that anything gives him benefit other than lying down."  (TR. 257) Dr. Gurgevich noted that Plaintiff "tends to blame others for his problems in the past.  I don't know to what extent this is just simply a part of his frustration in dealing with pain and the stress of being out of work.  He does speak very fondly of his ability to be a hard worker and to always enjoy working hard." (TR. 258)

Through August 23, 2000, Dr. Gurgevich and Plaintiff continued focusing on pain management techniques and psychological counseling which included hypnosis and visualization.  (TR. 260, 402-403) By August 23, 2000, Dr. Gurgevich and Plaintiff had met five times.  (TR. 403) Dr. Gurgevich reported that Plaintiff did "not find any significant benefit from mind/body methods of pain management.  He does find benefit from the psychological counseling in helping him deal with his present disability status."  (TR. 403) Dr. Gurgevich referred Plaintiff to Dr. Prust so that Plaintiff could inquire about fusion surgery or other modalities of pain relief.  (TR. 403)

On November 30, 2000, Dr. Lorenz indicated in a questionnaire from Plaintiff's long-term disability insurer that Plaintiff's injury was 100% work related and that Plaintiff experienced severe and persistent pain that became worse with mobility.  (TR.  266) In an accompanying Physical Capacity Evaluation form, Dr. Lorenz stated that Plaintiff could not work for any period during an eight hour day; Plaintiff could not lift any weight; Plaintiff could carry up to 10 pounds occasionally; Plaintiff could not climb, stoop, bend, kneel,  reach

above shoulder level or push pull; and Plaintiff could occasionally handle items.  (TR. 267)

Dr. Lorenz further stated:

> He is unable to do simple things like grocery shop; go camping; walk or sit for
> > few minutes...Pt has completed multiple trials of PT, several epidural
> injections, underwent biofeedback w/ Steve Gurgevich [without] any effect on
> his pain.

(TR. 267)  Medication "controls pain somewhat" but the pain increases with activities such

as walking, sitting for more than 20 minutes, and shopping.  (TR. 267)

Dr. Lorenz's notes from November 2000 through March 2001 indicate Plaintiff's

moderate depression and continued complaints of back pain.  (TR. 395)

On July 5, 2001, Plaintiff saw Debra Walter, M.D., on referral from Dr. Lorenz "with

regard to continuous sharp low lumbar pain and persistent popping with increased pain every

two hours on the average."  (TR. 269) Dr. Walter's examination revealed: "[s]traight leg

raising causes low back pain that is tolerated to 80° bilaterally with good hip rotation.  He

has observable spasm along the left lower lumbar paraspinals.  He's very tender locally in

the lumbosacral junction."  (TR. 269) Dr. Walter opined that Plaintiff "probably has a

segmental instability related to his disc changes with a superimposed chronic pain syndrome.

He is normal neurologically without clinical suggestion of recurrent radiculopathy."  (TR.

269) Dr. Walter recommended:

> 1. Lateral lumbar spine films with flexion and extension to assess for
>    instability.  If gross instability is documented a surgical consult is
>    appropriate.  If not, it still may impact on his impairment rating.
> 2. Consider home electrical stimulation to increase activity of lumbar
>    paraspinals.

(TR. 269)

In August 2001, Plaintiff reported to Dr. Lorenz that patches provided no relief and

that at one point, when he was rising from a chair, his "back popped and the pain was bad

like before."  (TR. 388; *see also* TR. 384)

In December 2001, Dr. Lorenz prescribed another course of physical therapy for

Plaintiff.  (TR. 15) Upon examination on December 18, 2001, Kate Jeremiah, P.T.,

(hereinafter P.T. Jeremiah) at Arizona Physical Therapy and Sports Rehabilitation, P.C.,

assessed Plaintiff as "presenting with significant functional deficits and mobility loss" and severe lumbar strain/spasm. (TR. 16, 21) Plaintiff underwent traction to the lumbar spine and he also began therapeutic exercises. (TR. 16-17) P.T. Jeremiah identified the following Functional Goals for Plaintiff:

1.  Able to lift 25 lbs. Using safe biomechanics and technique
2.  Driving, sitting and standing tolerance of 60 minutes.
3.  Safe ambulation sans straight cane.
4.  Sleep uninterrupted by back pain.
5.  Independent with a home self-management exercise program.
6.  Decrease pain complaint by 50%.

(TR. 17) By March 1, 2002,[4] Plaintiff could sleep through the night; sit for two hours at a time; and no longer required Vicodin for break through pain. (TR. 20) However, he continued to experience pain and a popping sensation resulting in severe pain. (TR. 20)

In an April 30, 2002 letter to Dr. Lorenz, P.T. Jeremiah summarized Plaintiff's progress and current status after 24 sessions of physical therapy as follows:

1.  Able to lift approximately 10 pounds with good technique with a mild increase in baseline pain.
2.  Upright sitting tolerance of 45 minutes. Pain increases in the central low back necessitates frequent position changes.
3.  Standing and gait tolerance "out and about" maximum 1.5 hours, again limited by increases in pain. Continued use of cane.
4.  Sleep interrupted by pain approximately 1-2x/night, compared to waking every hour prior to therapy. The patient was sleeping through the night with PT visits 2x/week.
5.  The patient is independent with and totally dedicated to his home program.
6.  Baseline pain range from 4/10 to 6/10, 10 being the worst possible pain. It should be noted that Mr. Dunn has been able to reduce his pain medication intake, decreasing his need for Oxycontin from 40 mg to 30 mg daily and he has discontinued his use of Vicodin...Also with respect to pain, the patient continues to experience occasional "pops" in the central low back that precipitate excruciating 10/10 pain, however they are much less frequent (weekly vs. daily) and much less severe. I have witnessed one of these "popping" episodes in the clinic and the event occurring in his spine is both palpable and audible. Imaging studies would be useful in identifying the nature and extent of what appears to be a highly unstable spine. Mr. Dunn also describes occasional

_____

[4]In March 2002, Dr. Lorenz diagnosed Plaintiff with LBP/S/P laminectomy segmental instability and continued him on physical therapy. (TR. 357)

"popping" episodes in which the pain after a "pop" is of such severity that it triggers nausea and vomiting.

(TR. 353-354) P.T. Jeremiah's made the following assessment:

Mr. Dunn has certainly made progress during the course of therapy, but functional losses remain. Gains were more dramatic when the patient was seen 2x/week compared [sic] the period of 1x/week visits. He has been contending with this back condition for almost 4 years and recovery will take some time. He has shown slow but steady improvement overall and has shown total dedication to the program we have put together. As long as measurable functional gains continue, physical therapy is both appropriate and justified. Our goals remain the same.

(TR. 354) P.T. Jeremiah recommended follow up imaging and continued physical therapy twice weekly. (TR. 354)

Regarding Plaintiff's mental condition, Dr. Lorenz referred Plaintiff to Mavis J. Donnelly, Ph.D. , in December 2001 for psychiatric consultation and treatment. (TR. 11-14) Upon examining Plaintiff on December 6, 2001, Dr. Donnelly noted Plaintiff's complaints of pain and popping sensations, inability to sleep more than one to two hours at a time, poor appetite and a 20-pound weight loss. (TR. 11-14) Dr. Donnelly's diagnosis was "MDD Simple." (TR. 14)

On December 20, 2001, Dr. Donnelly completed a "Physician Questionnaire" on Plaintiff's counsel's letterhead. (TR. 7-8) Dr. Donnelly indicated that Plaintiff's condition was not stationary; that Plaintiff was in need of psychotropic medication and monthly supportive psychotherapy; and that Plaintiff cannot return to work even on a part-time basis. (TR. 7-8) Dr. Donnelly diagnosed Plaintiff with work-related depression. (TR. 8)

In January 2002, Dr. Donnelly's progress notes indicate that Plaintiff is sleeping " a lot better...He is clearly very demoralized by his situation...describes severe marital stress since his injury." (TR. 10) Dr. Donnelly prescribed Remeron. (TR. 10; *see also* TR. 14)

Plaintiff continued treatment with Dr. Donnelly (TR. 9-10) and by June 26, 2002, Dr. Lorenz noted that Plaintiff was taking the following medications for his mental condition: Remeron, Wellbutrin, and Adderal which helped his mood although he "[d]oes express extreme anger at new case worker...Frustration level continues to be quite labile." (TR. 351)

- 15 -

Dr. Lorenz also reported that "[t]here is significant improvement since his recent physical therapy and beginning use of muscle simulator." (TR. 351)   Dr. Lorenz's diagnosis was:

1.     Chronic low back pain, status post laminectomy
2.     Depression, stable

(TR. 351)

However, on August 31, 2002, Plaintiff attempted suicide by overdosing on his medication. (TR. 317) On September 26, 2002, Dr. Lorenz diagnosed:

1.     Low back pain–chronic status post laminectomy
2.     Severe depression
3.     Occasional postprandial nausea
4.     Recent medication overdose

(TR. 349) Dr. Donnelly's and Dr. Lorenz's records track Plaintiff's depression through 2003. (*See* TR. 315-317, 329-347)

Additionally, on October 20, 2003, Dr. Lorenz indicated that Plaintiff was 100% disabled due to lumbosacral spine impairment. (TR. 333)

On March 4, 2004, Dr. Donnelly made the following comments after reading the ALJ's January 26, 2004 decision denying Plaintiff's claim:

> He continues to treat with me with appointments every two months...I do not see evidence of malingering by Mr. Dunn. In our many appointments since 12/01, his presentation physically is consistent. Moreover, he has made psychological gains, e.g. less overtly hostile and hopeless. If he were malingering, I would expect to see much more resistance to my observations and confrontations.
> It is possible, certainly, that he is somatizing, ie manifesting mental distress in physical symptoms. He definitely does not have somatization disorder, the diagnosis would be Pain Disorder with both Psychological Factors and General Medical Condition. The crux of this diagnosis is whether psychiatry/internal medicine finds a physical condition that could produce pain and disability. At any rate, the definition of somatoform disorder entails the patient *not* consciously 'faking.' The process of somatizing is unconscious. It is found in people who typically are inarticulate about and uneasy with complex psychological conflicts. They often believe that psychological symptoms reflect weakness, whereas physical symptoms are more 'legitimate.'

(TR. 279-280) (emphasis in original).

Although Dr. Donnelly could not identify other stressors that were causally responsible for Plaintiff's presentation, she did not think that Plaintiff was "lazy" or that he did not want to work, (TR. 280) "He appears quite miserable with his lifestyle as is, with

terrible self-esteem and shame.  The only causal 'event' of which I am aware is the industrial injury.   Lacking surveillance or other contradictory information, I believe this is a consequence of the injury."  (TR. 280)

> Regarding Plaintiff's ability to work, Dr. Donnelly stated:
>
> Psychiatrically he is clearly compromised and will likely be on medication for at least twelve months after return to gainful employment.   He is psychiatrically able to work at a very reduced level and schedule at least initially.  I am not sure what jobs he could do physically, however.  He is too labile for service-level work.  His concentration is poor, at least according to Mr. Dunn.  By his history, he was doing adequately in all domains prior to the injury.

(TR. 280)

In April 2004, Dr. Lorenz made the following comments after reviewing the ALJ's January 26, 2004 denial of Plaintiff's claim.  (TR. 276)  Dr. Lorenz stressed that Plaintiff's functional capacity changed very little since his back surgery. (TR. 276) Prior to her April 2000 physical assessment, she recommended job retraining at least twice because Plaintiff had no clear neurologic deficits; because he would not be able to return to his previous work; and because she was of the opinion that job retraining "would help his emotional state, which began to decline early in 2000."  (TR. 276)  Plaintiff "was never able to tolerate the job retraining.  Ultimately his pain was exacerbated."  (TR. 276) Although Plaintiff has made some progress since his injury, "[h]e has never been able to stand or walk predictably for any significant length of time.  He has always needed to lie down frequently throughout the day. His needed position changes include sitting, lying, walking regularly.  My recommendations for job retraining were in hopes that there would be a job which would allow such position changes and flexibility.  My recommendations for job retraining did not result from a belief that his condition had significantly improved."  (TR. 276)

Regarding her April 2000 disability assessment, Dr. Lorenz did not recall a worsening of Plaintiff's low back pain.  (Tr. 276-277) "His functional capacity remained quite static and I believe my assessment statements reflect this.  It was in January 2000 that this patient first began to describe the instability in his lumbar spine area, which I believe continues."  (TR.

277) Dr. Lorenz assessed Plaintiff as having "functional limitations...related to subjective pain and immobility. There have been no clearly objective neurologic findings since his discectomy.[5] I believe this does not eliminate the possibility of disability in this patient. Initially his disability was purely physical, but at this point in time it has become combination of emotional, psychological and physical disabilities." (TR. 277)

    2.    State-Agency Consultative and Non-Examining Physicians

On July 2, 1999, Medical Consultant Hayden, M.D., completed a Residual Physical Functional Capacity Assessment regarding Plaintiff. (TR. 200-207) Dr. Hayden concluded that:

- Plaintiff could lift and/or carry up to 10 pounds occasionally and frequently

- Plaintiff could stand at least two hours in an eight-hour workday

- Plaintiff could sit about six hours in an eight hour workday

- Plaintiff was unlimited in his ability to push or pull, including operation of foot controls

- Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl

- Plaintiff should avoid vibration and hazards such as machinery and heights.

(TR. 200-206) Dr. Hayden cited the May 1999 ERGOS evaluator's finding that a fairly extensive work conditioning program would likely be required. (TR. 207) "Even given slow recovery, [Plaintiff]...should be able to do this RFC by 8/99." (TR. 207)

On October 9, 1999, Medical Consultant E.W. Eberling, M.D., completed a Residual Physical Functional Capacity Assessment regarding Plaintiff. (TR. 229-236) Dr. Eberling took into account Plaintiff's "persistent low back pain following lumbar laminectomy at L5-S1" when he made the following findings:

- Plaintiff could lift and/or carry up to 20 pounds occasionally

- Plaintiff could lift and/or carry up to 10 pounds frequently

---

[5]Elsewhere in the record various physicians refer to the procedure as "diskectomy."

- 18 -

- Plaintiff could stand or walk about six hours in an eight-hour workday

- Plaintiff could sit about six hours in an eight-hour workday

- Plaintiff was unlimited in his ability to push or pull, including operation of foot controls

- Plaintiff could frequently climb ramps or stairs and balance

- Plaintiff could occasionally kneel, crouch, crawl, and climb ladders, ropes, or scaffolds.

- Plaintiff was unlimited in his ability to reach in all directions.

(TR. 230-233) Dr. Eberling noted safety concerns with heights and operating machinery. (TR. 233)

On April 25, 2000, John LaWall, M.D., performed an independent medical evaluation focusing on Plaintiff's psychiatric and neurological aspects. (TR. 251-254) Dr. LaWall's examination of Plaintiff's back revealed:

> a very straight back with a decreased lumbar lordosis, fullness in the left upper gluteal area, pain on palpation in the area of his laminectomy scar, very tight paraspinous muscles...He walks with a shuffling kind of waddling gait, trying not to move his back....Straight leg raising is negative for radicular pain though he reports back pain.

(TR. 253) Dr. LaWall's opinion was that:

> ...[Plaintiff] is status post herniated disc with laminectomy with ongoing pain complaints. There is little convincing evidence of a chronic radiculopathy. He also suffers psychiatrically from a pain disorder due to a general medical condition and psychological factors including anxiety and depression. One might also add a diagnosis of depression, not otherwise specified.

(TR. 253) Dr. LaWall further stated that he had difficulty evaluating Plaintiff because he did not know the degree to which Plaintiff's condition was "volitional, meaning his complaints are largely subjective." (TR. 253) Dr. LaWall "suspected" a strong component of somatization because "[i]t is simply not credible to think that physical therapies truly worsen his back in any substantial way...Be that as it may, I don't think he is stationary and stable." (TR. 253) Dr. LaWall recommended a "multifacted treatment program aimed primarily at his pain difficulties...Once there has been one more all out effort at treatment, I would close his

case at that point." (TR. 253) Dr. LaWall did not expect Plaintiff's condition to worsen and based on a June 1999 evaluation in the record, found that Plaintiff could perform light work. (TR. 253)

Plaintiff saw Dr. LaWall for another independent medical evaluation on May 9, 2002 to assess Plaintiff's psychiatric condition. (TR. 325-328) Dr. LaWall's impression was major depressive disorder. (TR. 328) He opined that the condition "was new, additional or previously undiscovered." (TR. 328) He further stated that:

> taking his condition at face value, that is pretty much going by his self report and what is observable about his behavior, mood and thinking during my brief visit, I don't see him doing much in the way of work.

(TR. 328) Dr. LaWall did not see Plaintiff as a candidate for psychotherapy because Plaintiff was "so negative." (TR. 328) Nor did Dr. LaWall find that Plaintiff was "able to engage in any kind of therapeutic process." (TR. 328) Dr. LaWall also commented that it was possible that Plaintiff could be malingering given that he met three of the four Diagnostic Statistical Manual criteria for strongly suspecting malingering, i.e., medical/legal context of presentation, poor cooperation with the exam, and findings out of proportion to complaints. (TR. 328)

Dr. LaWall performed a third independent medical evaluation on October 11, 2002 regarding Plaintiff's psychiatric condition. (TR. 320-324) Dr. LaWall's impression was:

- Plaintiff continues to suffer from a clinically significant depression which could be diagnosed as major depressive disorder or depression not otherwise specified
- psychological factors have some impact on his pain tolerance and perception of his back condition
- Plaintiff is "consumed by anger," "has an essentially paranoid stance," "is negative, pessimistic and his thoughts about things that might improve his psychological condition are essentially unrealistic."
- Plaintiff's condition is stationary

(TR. 323-324) Dr. LaWall did not "believe that Mr. Dunn is a candidate for employment, vocational rehabilitation or further active medical treatment based on his statements to me." (TR. 324) Dr. LaWall recommended that Plaintiff continue treatment with Dr. Donnelly. (TR. 324) Regarding Plaintiff's work capacity, Dr. LaWall's examination revealed that Plaintiff's concentration was not as impaired as Plaintiff indicated.  (TR. 324) "[I]t is obvious to me that there is residual work capacity from a physical standpoint because of the prior evaluations and from a mental standpoint because of the examination.  I cannot be more precise about this.  Saying anything about it at all is not completely rational since it is based on self-reported complaints of a highly subjective nature."  (TR. 324)

      C.     Vocational expert testimony

At the April 10, 2000 hearing, vocational expert Ms. Ruth Van Vleet testified that Plaintiff's previous work was performed at a light level of exertion and at a skilled level.  TR. 85) The ALJ posed a hypothetical that took into account Plaintiff's age, education level, and the assumption that Plaintiff was limited to no more than sedentary, unskilled work due to side effects of pain and medication, and that Plaintiff must be allowed to sit and stand at will but he need not have a two or three foot radius while he is changing positions and he should not work around hazardous machinery or unprotected heights.  (TR. 86) Ms. Van Vleet responded that a person with such limitations could perform "very simple production assembly type work which is sedentary, unskilled...Or very simple hand packaging type positions" and that such positions existed in the national economy.  (TR. 87)

The ALJ posed a second hypothetical based upon Plaintiff's reports of pain, trouble concentrating, and need to recline or lie down 80% of the time between 7:00 a.m. and 10:00 p.m. "...and even when he is reclining at night he can sleep for two or three hours" upon which he is awakened for 30 to 45 minutes before he can fall asleep for another two or three hours.  (TR. 87) Ms. Van Vleet testified that no jobs existed in the national economy for a person with such condition.  (TR. 87-88)

- 21 -

At the October 8, 2003 hearing, vocational expert Staci Schonbrun[6] testified.  Ms. Schonbrun stated that she did not agree with Ms. Van Vleet's opinion that hand packing was an option for Plaintiff because that job is not sedentary.  (TR. 442) Ms. Schonbrun testified that taking into account Dr. Lorenz's April 10, 2000 findings regarding Plaintiff's mental ability to perform work related activities (*see* TR. 247-248), such limitations would eliminate some but not all unskilled work.  (TR. 439-441) These limitations in combination with the limitations of the first hypothetical posed to Ms. Van Vleet at the April 10, 2000 hearing would leave half of the number of simple assembly jobs available to Plaintiff.[7]  (TR. 442) Ms. Schonbrun testified that Plaintiff could perform some categories of security type work but 50%-70% of the available positions would be eroded due to the sedentary requirement. (TR. 443)

Ms. Schonbrun further testified that considering the limitations posed by the ALJ in addition to the limitations set out in Dr. Lorenz's April 10, 2000 evaluation of Plaintiff's ability to perform physical work, Plaintiff would be unable to work.  (TR. 444-445) This same result is reached when considering the limitations posed by the ALJ in combination with Dr. Donnelly's December 20, 2001 finding that Plaintiff is not able to work even on a part-time basis.  (TR. 445)

D.      Other statements in the record

On April 5, 2000, Plaintiff's neighbor submitted a statement indicating that  after the accident, Plaintiff has been unable to do much around the house because of pain and that Plaintiff's activities such as fishing, driving, shopping, hobbies, and social outings have been limited for the same reason.  (TR. 156-162)

_____

[6]Although the October 8, 2003 transcript refers to the VE as "Ms. Shunbrun," her resume reflects the spelling of her name as: "Schonbrun."  (TR. 310)

[7]Ms. Schonbrun eliminated half of the simple assembly jobs because assembly is "typically light, not sedentary."  (TR. 442)

E.      The ALJ's Findings

1.      Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 C.F.R. §§404.1520, 416.920; *Baxter v. Sullivan*, 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id*.  If the ALJ concludes that the impairment is not severe, the claim is denied. *Id*.  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[8] to perform past work.   20 C.F.R. §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.  *Id*.  However, if the claimant cannot perform any past work due to a severe

---

[8]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 C.F.R. § 404.1545.

impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 C.F.R. §§ 404.1520(f). 416.920(f). At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA. *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

 2.  The ALJ's January 26, 2004 Decision

 Upon remand, the ALJ issued a decision on January 26, 2004  once again denying Plaintiff's application for benefits and that decision is at issue herein.  On January 26, 2004, the ALJ made the following findings:

1. The claimant has not performed substantial gainful activity since the alleged disability onset date.

2. The claimant met the disability insured status requirements of the Act on August 10, 1998, the date claimant stated he became unable to work, and continued to meet them through June 30, 2000, but not thereafter.

3. The medical evidence establishes that the claimant has these severe, medically determinable impairments: status post herniated nucleus pulposus with laminectomy at L5-S1 (3/99); and somatization disorder.

4. Claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 CFR 404, Appendix 1, Subpart P.

5. The claimant has an underlying medically determinable impairment that could possibly cause some pain or other symptoms, but claimant's allegations with regard to the severity and functional consequences of the symptoms are not fully credible.  (SSR 96-7p)

- 24 -

6.      Claimant retains the functional capacity to perform unskilled sedentary work with a sit/stand option.  Claimant has the ability to lift/carry ten pounds occasionally, up to ten pounds frequently, stand and/or walk at least two hours with breaks during an eight hour workday, and sit continuously with breaks for about six hours in an eight hour workday, must be able to sit and stand at will, but does not have to leave a two or three foot radius as he is changing positions, and should not work around hazardous machinery or unprotected heights.  He is limited to unskilled work by his medication side-effects.

7.      The claimant is unable to perform his past relevant work as appliance technician, air conditioning/plumbing technician, hardware store plumbing department manager and warehouse salesman.

8.      The claimant is 38 years old, which is defined as a younger individual (20 CFR 404.1563).

9.      The claimant has a ninth grade education (20 CFR 404.1564)

10.     The claimant does not have any acquired work skills which are transferable to the skilled or semiskilled work functions of other work.  (20 CFR 404.1568).

11.     Based on an exertional capacity for a restricted range of sedentary work, and the claimant's age, education, and work experience, the framework of Medical-vocational rule 201.24, Table 1, and the testimony of the vocational expert, support a conclusion of 'not disabled.'

12.     Although the claimant's capacity for the full range of unskilled restricted sedentary work has been compromised by his nonexertional limitations, there are a significant number of jobs in the local and national economy which he could perform. Examples of such jobs are: simple assembly jobs (50% of all assembly jobs leaving 1,400 jobs in Arizona, and 700,000 in the United States) or certain security guards (70% of all security guards leaving 4,950 jobs in Arizona and 300,000 jobs in the United States).

13.     The claimant was not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f)).

## DECISION

It is the decision of the Administrative Law Judge that, based on the applications filed effective May 21, 1999, the claimant is not entitled to a period of disability or disability insurance benefits under Sections  216(i) and 223, respectively, of the Social Security Act.

(TR. 287-296)

In reaching his conclusion, the ALJ reviewed Plaintiff's medical records dating back to the date of onset and extending beyond the June 30, 2000 date last insured.[9]  Although the ALJ determined that Plaintiff's underlying impairment "could possibly produce some pain or other symptoms," the ALJ concluded that Plaintiff's allegations of pain "exceed the limitations reasonably expected from the medical findings."  (TR. 291) To support his conclusion, the ALJ cited the following:

- Dr. Dunn found no evidence of radicular pain in March 1999 when Plaintiff complained of pain post-surgery

- the July 1999 MRI supported Dr. Dunn's finding

- the May 1999 ERGOS evaluation revealed that Plaintiff was capable of performing sedentary work and reported Plaintiff's submaximal effort during the evaluation

- In September 1999, Dr. Prust opined that Plaintiff's problems were muscular

- In November 1999, Plaintiff's physical therapist noted that his range of motion was "self-limited" and his pain reports were inconsistent

- In November and December 1999 respectively, Dr. Lorenz recommended job training with a ten to fifteen pound limit and retraining

- In April 2000, Dr. LaWall stated that Plaintiff's "complaints appeared to have a strong component of somatization and his characterization of the effect of physical therapy was incredible. "

(TR. 291) According to the ALJ, "[t]his evidence as a whole leads to the conclusion that claimant was able to return to work activity and his subjective complaints are excessive. " (TR. 291)

The ALJ stated that the only report from a physician before Plaintiff's date last insured that supports a disability finding is Dr. Lorenz's April 2000 assessment completed at the request of Plaintiff's attorney (TR. 291).  The ALJ characterized Dr. Lorenz's

---

[9]The ALJ reviewed evidence dated after June 30, 2000 "to see whether it provides any additional information relevant to the period on or before June 30, 2000."  (TR. 290)

assessment as an "attempt on her part to 'assist' her patient by completing the forms" to suggest disability "rather than an honest, well-documented medical opinion." (TR. 291-292) The ALJ cited Dr. Lorenz's finding that Plaintiff was able to lift 40 pounds. (TR. 291)   The ALJ pointed out that Dr. Lorenz's disability finding was made only four months after she opined that Plaintiff should undergo job retraining with a ten to fifteen pound lifting limit. (TR. 291) "There is nothing in her contemporaneous notes that suggest a sudden worsening of his condition or otherwise would explain the change in her assessment."  (TR. 291)

The ALJ mentioned "repeated indications by claimant's treating and examining health care providers that he was either exaggerating his symptoms and/or that claimant was not really trying to perform the routine tests required of him." (TR. 292)   However, when Plaintiff underwent aggressive therapy in 2002, significant gains in his progress were noted. (TR. 292)  Additionally, the ALJ noted that Plaintiff did not exhibit weight loss, or diffuse atrophy, or muscle wasting which are common side effects of chronic pain.  (TR. 292) Moreover, Plaintiff testified that he is able to cook, do some cleaning and light chores and that he is able to take walks, drive, run errands, and requires no assistance in personal grooming.  (TR. 292)

The ALJ accorded "substantial persuasive weight" to: Plaintiff's treating physicians with the exception of Dr. Lorenz's April 2000 physical assessment; and the May 1999 ERGOS evaluation showing Plaintiff's capability to perform sedentary work.  (TR. 293) Additionally, the ALJ accorded substantial weight to the opinions of the State Agency physicians "as supported by and consistent with the evidence of the entire record." (TR. 293)

III.    ARGUMENT

Plaintiff argues that the ALJ should have contacted Doctors Lorenz and Donnelly for additional information.  Plaintiff also points out that the ALJ mistakenly quoted Dr. Lorenz as recommending that Plaintiff could lift 40 pounds and that the ALJ failed to give substantial weight to Dr. Lorenz's April 2000 physical assessment.  Instead, the ALJ improperly discredited Dr. Lorenz's opinion by relying on non-examining physicians'

opinions and an ERGOS evaluation that was performed during an equipment malfunction and because the report was submitted upon request of Plaintiff's counsel.

Plaintiff also contends that the ALJ erred in finding that Plaintiff was non-compliant with prescribed treatment and that Plaintiff's complaints of pain were not entirely credible.

Defendant stresses that the ALJ was not required to contact Plaintiff's physicians because the record did not reveal any ambiguity in the evidence requiring such contact. Defendant also points out that Dr. Lorenz's April 2000 opinion which would result in a disability finding is contradicted by the Doctor's prior reports; is unsupported by clinical diagnostic evidence; and conflicted with other substantial evidence in the record such as the opinions of the state reviewing physicians.   According to Defendant, based upon the recommendations made by the state reviewing physicians, the ALJ's assessment that Plaintiff could not return to his previous work but instead could perform certain sedentary work took into account Plaintiff's need to shift positions.

Regarding Plaintiff's mental condition, Defendant maintains that evidence in the record   supports the ALJ's conclusion that Plaintiff was not disabled due to mental impairment by his date last insured.   Defendant also argues that the ALJ provided specific and legitimate reasons supported by substantial evidence when discrediting Plaintiff's credibility.

IV.     STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 423(d)(1)(A), an insured individual is entitled to disability insurance benefits if he or she demonstrates, through medically acceptable clinical or laboratory standards, an inability to engage in substantial gainful activity due to a physical or mental impairment that can be expected to last for a continuous period of at least twelve months.   The Ninth Circuit has stated that "'a claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national

economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

Pursuant to 42 U.S.C. §405(g), the findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted).  Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision.  *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)).  Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988).  However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.  A denial of Social Security benefits will be set aside if the Commissioner fails to apply proper legal standards in weighing the evidence even though the findings may be supported by substantial evidence.  *Winans,* 853 F.2d at 644.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly.  *Id.*  However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly.  *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975).  Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion.  *Id.* at 1156.  Moreover, "if

- 29 -

the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion  of a treating physician and that of an examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751.  Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted).  However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See  Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

V.     DISCUSSION

There is no dispute that Plaintiff is unable to return to his previous work, hence the ALJ's analysis proceeded to a step-five determination, i.e., whether Plaintiff is able to perform other work in the national economy.  The ALJ determined that Plaintiff could perform less than a full range of unskilled, restricted sedentary work such as simple assembly jobs or certain security jobs.

Plaintiff contends that the ALJ's finding is erroneous because opinions from Plaintiff's treating physicians, specifically Doctors Lorenz and Donnelly, indicate that Plaintiff's physical and mental conditions render him disabled.

A.    Plaintiff's Allegation of Mental Disability

Plaintiff must demonstrate that onset of his mental condition occurred before June 30, 2000, his date last insured.  On April 10, 2000, Dr. Lorenz, Plaintiff's treating primary care physician who has treated him at least since the August 1998 back injury, completed a mental assessment indicating that the areas evaluated were "unlimited/very good" or "good."  (TR. 247-248) She recognized that Plaintiff's physical disability is frustrating to him and that "mild-moderate emotional irritability noted as his disability persisted." (TR. 248)

On April 25, 2000, examining Dr. LaWall, who completed an independent medical evaluation, found that Plaintiff "suffers psychiatrically from a pain disorder due to a general medical condition and psychological factors including anxiety and depression.  One might also add a diagnosis of depression, not otherwise specified."[10] (TR. 254) Dr.  LaWall, like Dr. Lorenz, did not find that Plaintiff's mental condition alone or in combination with his physical condition prevented him from working.[11]  The opinion that Plaintiff's mental condition is disabling appears in the record long after June 30, 2000.  (*See* Dr. Donnelly's December 20, 2001 Physician Questionnaire at TR. 7-8) Moreover, although Plaintiff's depression was noted in the record prior to the date last insured, there is no evidence either predating or postdating Plaintiff's date last insured that would support the conclusion that onset of a disabling mental condition occurred prior to Plaintiff's date last insured.

B.    Plaintiff's Allegations of Physical Disability

The ALJ determined that Plaintiff was not disabled due to his back injury even though Dr. Lorenz completed a physical assessment on April 10, 2000 setting forth restrictions that support a disability finding.  The ALJ expressly rejected Dr. Lorenz's April 2000 physical assessment as follows:

---

[10]Later, in May 2002, Dr. LaWall diagnosed Plaintiff with Major Depressive Disorder and opined that the condition "was new, additional, or previously undiscovered." (TR. 328)

[11]Dr. Lorenz did find that Plaintiff's physical condition alone rendered him disabled. (TR. 249-250)

> ...substantial persuasive weight was accorded the claimant's treating and examining physicians (with the exception of the April 2000 physical assessment of Dr. Lorenz discussed above) as the best available knowledge and evaluation of his impairments and the degree to which these impairments would hamper him in the performance of job related tasks and duties...The ERGOS evaluation in May 1999, showing claimant capable of sedentary work with unlimited sitting was particularly complete.

(TR. 293)

"Although the treating physician's opinion is given deference, the ALJ may reject the opinion of a treating physician in favor of a conflicting opinion of an examining physician if the ALJ makes 'findings setting forth specific legitimate reasons for doing so that are based on substantial evidence in the record.'" *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002) (quoting *Magallanes,* 881 F.2d at 751). The ALJ can satisfy this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof and making findings. *Id.* "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Reddick,* 157 F.3d at 725. Opinions from non-treating and non-examining physicians may serve as substantial evidence to the extent that they are based on objective clinical tests. *Magallanes,* 881 F.2d at 751.

Prior to discussing Dr. Lorenz's April 2000 physical assessment, the ALJ provided a detailed summary of the facts and conflicting evidence. Yet, the ALJ's reasons for rejecting Dr. Lorenz's April 2000 physical assessment are inconsistent with and are not supported by the substantial evidence in the record as a whole.

Upon pointing out that Dr. Lorenz's April 2000 physical assessment was completed at counsel's request, the ALJ rejected it as an attempt to "assist" Plaintiff. (TR. 291-292) The mere fact that a medical report is provided at the request of counsel is not a legitimate basis for evaluation of the reliability of that report. *Reddick,* 157 F.3d at 726. Rather, the fact that the assessment was rendered in response to counsel's request "is relevant where the opinion itself provides grounds for suspicion as to its legitimacy." *Nguyen v. Chater,* 100 F.3d 1462, 1464 (9th Cir. 1996); *see also Reddick,* 157 F.3d at 726 ("Evidence of circumstances under

- 32 -

which the report was obtained and its consistency with other records, reports, or findings could, however, form a legitimate basis for evaluating the reliability of the report.") For example, the circumstances under which the report was obtained may be relevant where there is no objective medical basis for the doctor's opinion and that report is inconsistent with the doctor's prior treatment notes. *Nguyen,* 100 F.3d at 1464 (citing *Salee v. Chater,* 94 F.3d 520 (9th Cir. 1996); *Burkhart v. Brown,* 856 F.2d 1335 (9th Cir. 1988).  Indeed, the Ninth Circuit has expressly "clarif[ied]...that in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it."  *Reddick,* 157 F.3d at 726.

The ALJ cited the following factors to support his conclusion that Dr. Lorenz's assessment was not "an honest" opinion: the opinion was rendered "only four months after she opined that he should undergo job retraining with a ten to fifteen pound lifting limit" and nothing in Dr. Lorenz's contemporaneous notes suggest a sudden worsening in Plaintiff's condition or would otherwise explain the change in her assessment.  (TR. 291-292) The ALJ also cited the fact that Dr. Lorenz indicated Plaintiff was capable of lifting 40 pounds.  (TR. 291)

In her April 10, 2000 hand-written physical assessment, Dr. Lorenz opined that Plaintiff could occasionally  lift "<10 #."  (TR. 249) The ALJ misinterpreted Dr. Lorenz's use of symbols that were superimposed to signify that Plaintiff "is able to lift 40 pounds occasionally."  (TR. 291) Subsequent to the ALJ's decision, Plaintiff submitted to the Appeals Council a letter from Dr. Lorenz stating that she never indicated that Plaintiff was able to lift 40 pounds.  (TR. 276) "Plaintiff has *never* been able to lift this much weight since my first visit with him shortly after his injury in August 1998.  His functional capacity has actually changed very little since his back surgery." (TR. 276) (emphasis in original). Defendant does not dispute that the ALJ was mistaken.   (Defendant's XMSJ, p. 3) Nonetheless, Defendant stresses that the ALJ was correct to reject Dr. Lorenz's assessment because the evidence did not support it.

Review of Dr. Lorenz's pertinent records prior to the April 2000 physical assessment reflect that in November 1999 she recommended that Plaintiff begin "job retraining now with 10-15 pound weight limit." (TR. 246) By December 1999, subsequent to Plaintiff's refusal of "further physical therapy after one visit" and after consultation with Dr. Walter, Dr. Lorenz determined that Plaintiff was at the end of possible rehabilitative treatment. (TR. 245) Consequently, she stated that Plaintiff would be unable to return to his previous work. (TR. 245) By January 2000, Plaintiff was participating in pool therapy without improvement and he reported feeling a popping sensation in his low back followed by severe pain. (TR. 234) Plaintiff consistently continued to complain about this popping sensation followed by severe, debilitating pain throughout the course of his treatment. In fact, in April 2002, P.T. Jeremiah reported "witness[ing] one of these popping episodes in the clinic and the event occurring in his spine is both palpable and audible." (TR. 353-354)

Dr. Lorenz agrees that Plaintiff's chart did not reflect "a dramatic change (i.e. worsening) in his low back pain. His functional capacity remained quite static and I believe my assessment statements reflect this." (TR. 277) She points out that in January 2000 Plaintiff "first began to describe the instability in his lumbar spine area, which I believe continues. We have tried multiple modalities to strengthen and stabilize this instability, to no avail." (TR. 277) Dr. Lorenz also points out that: Plaintiff was never able to tolerate job retraining, "[u]timately his pain was exacerbated"; Plaintiff has never been able to stand or walk predictably for any length of time; he has always needed to lie down frequently throughout the day; his needed position changes include sitting, lying, walking; and her recommendation for job retraining did not result from a belief that his condition had significantly improved. (TR. 276) Review of the record reveals that Dr. Lorenz's April 2000 physical assessment is consistent with the evidence of record as a whole. The fact that Dr. Lorenz initially recommended a l0-15 pound lifting limit in November 1999 does not in and of itself mean that Plaintiff was in fact capable of lifting that weight when Dr. Lorenz completed the April 2000 physical assessment. By April 2000, it had become apparent on

the record that Plaintiff was not able to complete the retraining recommended in November 1999.

In reaching his opinion, the ALJ relied upon the May 1999 ERGOS evaluation stating that it "was particularly complete." (TR. 293) Plaintiff asserts that the ALJ improperly relied upon the ERGOS evaluation because an equipment malfunction during the evaluation rendered it unreliable. Defendant maintains that "[t]he vocational specialist indicated the areas upon which he could not render a complete opinion (such as Plaintiff's carrying capacity or stooping ability) (TR. 187). The specialist indicated no problem assessing Plaintiff's ability to sit. (TR. 187-189)." (Defendant's XMSJ, p.4 n.2) The ALJ did not acknowledge the equipment malfunction.

The ERGOS evaluator stated that "[b]ecause of an equipment malfunction, a physical capacity rating could not be established, but he did lift 10 pounds from the floor to shelf height (66") safely" although that effort caused severe pain in Plaintiff's low back. (TR. 187-188) The ALJ discounted Plaintiff's complaint because Plaintiff remained standing after making such complaint and because no significant increase in heart rate was recorded at that time. (TR. 289)

Additionally, the ERGOS evaluation indicated that Plaintiff could sit for 8+ hours occasionally, frequently and continuously and that Plaintiff could neither stand nor walk for any amount of time. (TR. 187) The evaluator observed that:

> [d]uring the standing work tolerance where he is required to sort 20 trays of pool balls with a 10' walking space between the testing station and the storage rack, on tray #18, as he is walking, the leg appears to give way. He reported his legs are numb. He does not fall, but he seeks out stable support with his hands. For this episode, significant heart rates are recorded.

(TR. 188)

The ALJ also pointed out that the evaluator opined that Plaintiff gave submaximal effort and although Plaintiff's heart rate increased significantly once in a while, such increase was not as consistent as would be expected. (TR. 289) The ALJ considered particularly persuasive the finding that Plaintiff could sit for an unlimited amount of time and that

- 35 -

Plaintiff "was capable of performing sedentary work." (TR. 293)   However, the evaluator recommended a "fairly extensive work conditioning program" focusing on increasing Plaintiff's cardiovascular condition, lifting strength, and back tolerance to work.  (TR.189) The ALJ did not address the evaluator's finding and comments about Plaintiff's intolerance for standing and walking.  Yet, the ALJ's hypothetical question to the vocational experts included a two-hour limit with breaks for standing and walking.  The question posed suggests that the ALJ disagreed with the ERGOS evaluator's findings on that point.

Additionally, the ALJ's reliance on Dr. Dunn's March 1999 post-surgery finding of no evidence of radicular pain, is undercut by subsequent findings of "radicular low back pain" and "lower extremity radiculopathy" in September 1999 and November 1999 by Doctors Prust and Lorenz respectively.  (*See* TR. 223, 246)

Plaintiff also argues that the ALJ improperly cited Plaintiff's failure to follow  a prescribed regimen.  Upon the proper showing, the ALJ may deny a claim based on the claimant's refusal without good reason to follow prescribed treatment.  *Byrnes v. Shalala,* 60 F.3d 639, 642 (9th Cir. 1995) (citing 20 CFR § 404.1530) To deny a claim under section 404.1530, the ALJ must develop a record establishing by substantial evidence that the claimant's impairment is reasonably remediable by the particular individual involved, given his social or psychological situation, and that he lacks good cause for failing to follow the prescribed treatment program.  *Id.*  (citations omitted).  The ALJ must also find that the claimant would return to work if he followed the prescribed treatment.  *Id.*

The ALJ herein stated that there are "numerous references in the medical evidence which are indicative of Plaintiff's non-compliance with medical regimen specified by his physicians...Claimant's noncomplaince does not support the alleged intensity and duration of pain and subjective complaints."  (TR. 292)   The ALJ specifically cited Plaintiff's resistance to physical therapy and stated that when Plaintiff "went through aggressive therapy in 2002, significant gains in his progress were noted."  The ALJ cited P.T. Jeremiah's March 1, 2002 progress note indicating that Plaintiff has a "sitting tolerance of 2 hours vs. 15

minutes prior." (TR. 292)  Yet, the ALJ did not cite P.T. Jeremiah's April 30, 2002 letter to Doctor Lorenz stating that Plaintiff had achieved an "[u]pright sitting tolerance of 45 minutes.  Pain increases in the central low back necessitate frequent position changes." (TR. 353)

Although the ALJ characterized Plaintiff's work with P.T. Jeremiah as "aggressive therapy," he does not define this term.  P.T. Jeremiah described the program as physical therapy involving manual therapy and therapeutic exercise aimed at restoring functional mobility, strength, endurance, lumbar stabilization and normal gait. (TR. 353) Additionally, Plaintiff testified that the physical therapy he attempted prior to referral to P.T. Jeremiah "was aggressive therapy where they had me trying to lift heavy weights and push sleds, doing like calisthenics type exercises, push-ups, sit-ups, had me trying to do all these kinds of things.  And it–all it did was aggravate the situation, the back pain." (TR. 435) Whereas, Plaintiff described his program with P.T. Jeremiah as "low impact therapy which consisted of muscle manipulation, through her moving my body and my legs, arms, and heat and cold treatments, heat packs, cold packs, stretching exercises, that sort of thing." (TR. 436) Plaintiff's treatment records with P.T. Jeremiah reveal that once Plaintiff found a program that he could tolerate, he has "shown total dedication to the program" although his progress has been slow. (TR. 354)

Herein, Plaintiff's failure to completely follow the prescribed physical therapy or other regimen, which the ALJ did not specify, was not the sole reason for the denial of Plaintiff's claim. The record reflects that in one post-surgery instance Plaintiff refused further physical therapy after only one visit.  Plaintiff did attend some conditioning soon after surgery, at least five physical therapy sessions with P.T. Snyder,  and pool therapy all to no avail prior to Dr. Lorenz's April 2000 physical assessment.  Since surgery and the April 2000 assessment, Plaintiff attended several appointments with Dr. Gurgevich for pain management techniques and he began pursuing what he characterizes as "low impact" physical therapy with P.T. Jeremiah in December 2001 and that Plaintiff  has shown some improvement after working

with P.T. Jeremiah. On this record, Plaintiff's inability to complete some of the recommended physical therapy or to achieve the expected results from the various therapies attempted prior to Dr. Lorenz's April 2000 physical assessment does not significantly contribute to a finding of not disabled. Instead, such evidence shows that by the time Dr. Lorenz rendered her April 2000 opinion, Plaintiff had attempted and failed the recommended conditioning programs and he was complaining of symptoms indicating segmental instability.

According to Dr. Dunn, "about 90% of the people receive improvement with surgery so he can return to his normal work."[12] (TR. 195) Thus, the expectation was that Plaintiff would be able to return to work after completing a required work back program. (TR. 195) From April 1999, one month after the surgery, when Plaintiff first began physical therapy through December 1999,the treating and examining physicians continued to indicate that with some form of physical therapy or conditioning program Plaintiff should be able to improve enough to achieve the ability to return to some level of work. The record reflects that Plaintiff could not tolerate the physical therapy or he showed no improvement after the course of therapy. Thus, by April 10, 2000, approximately 20 months after the initial injury and 13 months after surgery, Dr. Lorenz rendered her disability opinion. Contrary to the ALJ's statement that Dr. Lorenz's assessment was not "well-documented," the record supports the conclusion that Dr. Lorenz's opinion took into account Plaintiff's lack of progress since his surgery.

Dr. LaWall's April 25, 2000 independent medical examination does not alter this conclusion. Although Dr. LaWall questioned Plaintiff's report that physical therapy caused his pain to worsen, Dr. LaWall nonetheless concluded that Plaintiff was not "stationary and stable." (TR. 253) Moreover, Dr. LaWall, too, recommended a multifaceted treatment

---

[12]Implicit in Dr. Dunn's statement is that "about [10%] of the people" do not improve after surgery. (TR. 195) The record does not explore the factors indicating the patient was among that 10% where surgery failed.

program. (TR. 253) Dr. LaWall's reference to a June 1999 functional capacity evaluation[13] showing that Plaintiff could do light lifting also acknowledged that such evaluation recommended "[p]hysical therapy and work hardening." (TR. 251) By April 2000, it was apparent that the predictions made in 1999 were premised on the conclusion that that Plaintiff would recover as expected and the record, including Dr. LaWall's April 25, 2000 evaluation, supports the conclusion that Plaintiff's recovery was not as expected.

The substantial evidence in the record as a whole supports the conclusion that absent successful results with physical therapy or other conditioning programs, Plaintiff could not return to any work. There has been no suggestion in the record to the contrary. Plaintiff had not achieved such results when Dr. Lorenz completed her April 2000 physical assessment. Thus, the substantial evidence in the record supports her opinion. Nor is there any evidence in this record that "provides grounds for suspicion as to...[the] legitimacy of" Dr. Lorenz's April 10, 2000 physical assessment.[14] *Nguyen,* 100 F.3d at 1464. Therefore, the ALJ improperly rejected Dr. Lorenz's April 10, 2000 finding that Plaintiff was disabled.

Where the ALJ failed to provide legally sufficient reasons for rejecting a treating physician's opinion, the Ninth Circuit credits that opinion as true. *Benecke v, Barnhart,* 379 F.3d 587, 594 (9th Cir. 2004). Crediting Dr. Lorenz's assessment as true results in the finding that Plaintiff is indeed disabled under the Social Security Act.

Remand for an award of benefits is appropriate where:

(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

---

[13]Dr. LaWall does not state who performed the June 1999 evaluation.

[14]Indeed, the ALJ did not reject Dr. Lorenz's April 10, 2000 mental assessment that Plaintiff was not disabled because of a mental condition even though that report was made upon counsel's request.

*Id.* at 593 (citations omitted).   Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits."  *Id.* (citations omitted); *see also Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995).  As set forth above, the ALJ failed to set forth legally sufficient reasons for rejecting Dr. Lorenz's April 10, 2000 physical assessment and disability finding.  Further, since the 1999 filing of Plaintiff's claim,  the matter has been remanded once before and has come on twice for hearing.  The record is complete and there are no outstanding issues that must be resolved before a disability finding can be made. There is no dispute that the restrictions specified by Dr. Lorenz when credited as true, require a finding of disability.  (TR. 444-445, *see also* Defendant's XMSJ, p.3) Therefore, the requirements for remand for an award of benefits have been met.

It has been almost seven years since Plaintiff applied for benefits.  The Ninth Circuit has recognized that "[r]emanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to 'tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.'" *Benecke,* 379 F.3d at 595 (*quoting Varney v. Secretary of Health and Human Services,* 859 F.2d 1396, 1398 (9th Cir. 1988); *see also Terry v. Sullivan,* 903 F.2d 1273 (9th Cir. 1990) (remanding for an award of benefits where the plaintiff applied almost four years prior); *Erickson v. Shalala,* 9 F.3d 813 (9th Cir. 1993) (remanding for an award of benefits where plaintiff, who was disabled under the Act, "ha[d] been waiting for well over four years for his disability benefits").  On the instant record, where the ALJ failed to provide adequate reason for rejecting the opinion of Plaintiff's treating physician, (i.e., Dr. Lorenz's April 10, 2000 physical assessment)  and where Plaintiff has satisfied all three factors in favor of a remand for an award of benefits, "[r]emanding for further administrative proceedings would serve no useful purpose and would unnecessarily extend...[Plaintiff's] long wait for benefits." *Benecke*, 379 F.3d at 595. *See also*. *Regennitter v. Commissioner,* 166 F.3d 1294, 1300 (9th Cir. 1999) (where the court

"conclude[s] that...a doctor's opinion should have been credited and, if credited, would have led to a finding of eligibility, we may order the payment of benefits.");  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990) (remanding for payment of benefits where the Secretary did not provide adequate reasons for disregarding examining physician's opinion); *Winans,* 853 F.2d at 647 (same).  Therefore, Plaintiff's Motion for Summary Judgment should be granted and this matter should be remanded for an award of benefits.

VI.   RECOMMENDATION

    For the foregoing reasons,  the Magistrate Judge recommends  that the District Court grant Plaintiff's Motion for Summary Judgment (Doc. No. 11), deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 13), and remand this action for an award of benefits.

    Pursuant to 28 U.S.C. §636(B), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation.  If objections are filed, the parties should use the following case number: CV 04-444-TUC-JMR.

    If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

    The Clerk of Court is directed to send a copy of this Report and Recommendation to the parties and/or their counsel.

    DATED this 13th day of April, 2006.


_____

Héctor C. Estrada
United States Magistrate Judge